Good morning, your honors. May it please the court. My name is Michael J. Van Zant, representing the appellants in the case, Dr. John Alexander and John Alexander Research Company. This case, as the court is aware, arises under CERCLA, or Superfund, and is a cost recovery action by the Department of Toxic Substances Control of the state of California. I want to point out for the court preliminarily that this is not a case where a recalcitrant polluter shirked his responsibilities to remove material from a site. Dr. Alexander, in fact, has spent over nearly $3 million in the cleanup of this site, even though most of the contamination, as the record shows, was caused by his predecessors. And indeed, Dr. Alexander has paid oversight costs in connection with the removal of the materials. Those preexisting problems were largely known to him, weren't they? They were, when he took over the site. Yes, your honor. He volunteered to conduct the soil cleanup at the site, but the state stopped him, and after 18 months, they issued an imminent and substantial endangerment order, and then the years before the cleanup was actually effected. But the point is, the selected remedy could have long ago been accomplished, except that DTSC chose to prolong the process and, in fact, increase its response costs. Now, what DTSC seeks here is reimbursement not for the cleanup and not for the removal costs, because those were paid by Dr. Alexander, but strictly the costs that it incurred to pay its own employees to watch over what Dr. Alexander and John Alexander Research did at the site to conduct the cleanup. Is it your position that they shouldn't have done that or that they weren't authorized to do that? On entitlement, I understand you have some complaints or claims with respect to calculation and amount, but in terms of the state's entitlement to be reimbursed for these activities of supervision, do you have a concern about that? No, we don't dispute that. It was a state-led cleanup, your honor, and so clearly the state under Superfund was entitled to recover the response costs if they conducted it in a manner not inconsistent with the National Contingency Plan. That's the real issue. Your concern is whether it takes 12 people to screw in the light bulb? Well, that's partly it, but it's also whether or not the state process that was adopted by the Department of Toxic Substances Control to analyze the conditions at the site and ultimately just to select the remedy are consistent with the National Contingency Plan. The key to this is there is no pre-enforcement review while the cleanup is going on at the site. So the only way that an entity or person can understand whether or not the remedy that's being selected is cost-effective, permanent, and necessary under Superfund is if, in fact, the state in going about this process does it consistently with the National Contingency Plan. That's a precondition to the state recovering its costs. Well, it had to be cleaned up, right? It did have to be cleaned up, your honor. And which method did your client propose that should have been effected that wasn't effected? Well, there was a number of remedies that were talked about. Soil washing was one of them. Ultimately, the... Is that the one you think they should have done? Well, we didn't get a chance to go through the demonstration on the soil washing. Ultimately, what... They said it was unproven or it was too new and they weren't sure that it would work, right? Well, we believe the technology probably would have worked, but the state wanted us to demonstrate through a pilot plant, which would have been very expensive. So you didn't want to do that, obviously. We did not want to spend that money to make that demonstration. But we believe that the technology would have worked. So the question then became, what is a permanent, cost-effective and necessary remedy as you go through the analysis under the National Contingency Plan? And that is kind of the key to the issue because that protects the rights of the individual, the responsible party who may be affected ultimately by the cost recovery action that may ensue. Because there's only one way for that person to actually get into the mind of the Department of Toxic Substances Control in how they went about the process of deciding on that remedy, and that is only if a record is created. That record is very, very important and the record must track in a manner that is not inconsistent with the National Contingency Plan. But what... Besides the soil washing, what was your proposal? Your client's proposal? Well, there were a couple of different ones in the final. Now, realize that what's happening is you have documents that are created by engineering consulting firms, and the engineering consulting firm came up with three or four different remedies. Off-site removal and clean-up, for example, was one. The cap and containment... That was kind of expensive. They really saved you money on that, Frank. At least that's their position. That would have been expensive, over $2 million just to do that one. The cap and containment one was the one that was actually chosen. I don't... The court's asking me which one we proposed, and we didn't propose a remedy. You just sat around, let them choose, and then... Well, the process... Your Honor, the process is one of narrowing. You start off with slight characterization. You determine the universe of alternative remedies. You go through a And then ultimately you get down to a remedial investigation report that analyzes the effectiveness of those remedies, what their costs are, and whether they are necessary, whether they are effective, essentially, to effect the clean-up. That process is under the control of DTSC. So when we send documents... They don't preclude you from participating, right? I mean, suggesting and giving ideas. You had an expert. Correct. And we did participate fully in that process and helped select the final subset of remedies, including proposing the cap and containment, which ultimately was selected by DTSC. I think what we want to focus on initially here is the question of whether or not the trial court erred in its attempt, in the face of the gaps in the record here, to fill in those gaps by inferring certain missing items or determining the documentation of certain items need not be in writing. And there was a... If you look at the trial court's findings of fact and conclusion of law, there are some very pointed examples. I point Your Honors to page 36 and 37 of the opening brief on the main action, table 1, which kind of lays out some of these examples. But one that the trial court determined was that there's no requirement for a written community relations plan. That clearly is required by the national contingency plan. And that was an error on the part of the court. It's a very important part of the process because it not only engages the community as a whole, but it also helps identify sensitive members of the population who might be affected by the remedy, who might need more protection than just the general population. Despite the fact that... It might have made it more expensive on your client, right? It might have been more expensive. They might have wanted to do that hauling off the premises. Well, there's a major issue with regard to the remedy that was selected. As the record indicates, the cap has failed at least twice since it was installed. And so that's causing continuous maintenance, which is something that was never contemplated in the documents that were prepared on behalf of DTSC, and certainly not in the remedial action plan, which is the decision document that ultimately DCSC approved. The trial court also determined that no remedial investigation report was required to be in writing, even though one is required under the national contingency plan. Also, the court found that the remedial action plan approved by DTSC, and that would be the substitute for the record of decision, does not explicitly consider cost-effectiveness of the remedy. That's a major failing in the analysis that was done in support of the remedy, and it's one that's absolutely required by the national contingency plan. Finally, the remedial action plan does not consider the permanency of the remedy. That is also a mandatory requirement under the national contingency plan. As I indicated, the cap has failed at least twice since it was installed, and we anticipate that we will have ongoing and continuous maintenance, or perhaps even replacement of that cap. Substantively, the remedy chosen by DTSC is not a cost-effective remedy, and it did not consider these ongoing operation and maintenance costs, and it does not allow productive use of the site. Also, the remedy selected is not permanent. This cap is not really intended to be a permanent solution. Was it thought to be when it was put in effect? No, it was not. That consideration is not included in the remedial action plan. It's not really talked about. Judge Wenger, in his findings of fact, conclusions of law, in fact, indicates that that's one of the failings of the remedial action plan. It does not address the permanence of the remedy. One of the things that the national contingency plan is looking for is finality, you know, dealing with this only once and not having to go back again and again to resolve the same problem. Finally, the trial court found that the remedial action plan did not address two of the four mandatory considerations under the national contingency plan, including cost-effectiveness and the use of alternative technologies. Again, these are problems with the decision-making document. The trial court sought to heal the gaps in the record and the analysis by stating that one could infer the existence of missing documents, analysis or consideration, or determine somehow that a document that should be in writing, such as the community relations plan or the remedial investigation report, need not be in writing. But I point out to the court that we're really talking about an administrative record case here. When the trial proceeds, there's an administrative record that should be certified as the decision record that DTSC relied upon. That is the basis for their decision. The court, of course, is making a de novo review of that record, just as this court is entitled to make a de novo review of that record. And there's no way that any of those gaps and missing documents can be healed at this point. The state just failed to include those in the record. The missing analysis, the missing documents, runs afoul of the requirement that the agency examine relevant data and explain the evidence that is available and offer a rational connection between the facts found and the choices made. And that's the Motor Vehicles Manufacturing Association case out of Supreme Court in 1983. These failings are material and prejudicial and they prevent the full and fair review of the remedy selected by DTSC. This case, I wanted to point out to the court, is not like Chapman v. U.S., which the trial court believed was a similar case. Chapman dealt with a removal action, not a remedial action. And those are two different things under the National Contingency Plan. The requirements for analysis of a situation involving a removal, which is really just taking away the material, not dealing with the soil contamination, that's a very different kind of process and it's a much shorter and less complex process than a remedial action. In addition, Chapman proceeded on hearsay declarations from Mr. Chapman in a summary judgment process and not a full-blown trial. It's not really very analogous to our situation. This case, obviously, is more like the Washington Department of Transportation case, we believe, except that DTSC was fully aware of the National Contingency Plan requirements. A couple of other issues that I'd like to address to the court is, one is that the trial court, we believe, erred when it allowed the recovery of response costs where DTSC failed to follow state guidelines for development of the timesheets in particular. As you know, the trial court reduced the amount of time that Mr. Shaddy, who was the project manager, applied to the project by 25 percent, even though his timesheets and his testimony seem to indicate that he rounded up on occasions perhaps by as much as 50 percent or 75 percent on occasions. The timesheets, of course, also lacked the detailed backup. Mr. Shaddy, we believe, testified that, in fact, the backup material that he used to write his timesheets, he would routinely destroy those. This question really goes to the question of whether or not these documents are trustworthy enough in order to be admitted into evidence under the public records exception to the hearsay rule. The trial court also, we believe, erred when it allowed the AG's timesheets to be admitted into evidence. This was a discovery abuse issue where the court found that the attorney general, deputy attorney general, who was reviewing the discovery request wrongfully determined that the attorney general's timesheets, which were an element of damages in the case, did not have to be produced under the discovery request. The trial court found specifically that that was a wrongful determination by DTSC and by the attorney general and that those timesheets should have been turned over. Nonetheless, the trial court did not prevent them from being used at trial, even though the defendants did not have the opportunity to do any discovery because discovery had closed by the time the timesheets were turned over. They produced them a little bit before trial. Two months, Your Honor. Two months. Discovery had closed at that point. But you had access to them then if you wanted to. We did, but without going through discovery and finding out the details of what was contained in those timesheets and the basis for them, there was no way that we could do an inquiry so that we could do an intelligent cross-examination of the witnesses. Did you ask the court permission to do that? I do not believe that we did. No, you're wrong. In fact, you didn't examine the records, right? Pardon me? In fact, you didn't examine the records. They were offered to you and you refused. Well, they were ultimately examined. I mean, they were available at trial, and so they were examined and the two of them... They were offered, what, two months before trial? Two months before trial, yes, Your Honor. And the two attorneys did testify at the trial, so there was an opportunity to cross-examine them. The last point I'd like to address quickly is the indirect cost issue. There seems to be a large differential here, $60,000 for direct costs and $102,000 for indirect costs. We believe that the formula that's being used by the state here is not appropriate because it brings in other state agencies other than DTSC into the indirect cost equation. And if I may, I'd like to reserve the remaining of my time for rebuttal. Thank you, counsel. Thank you. Good morning, Your Honors. May it please the Court. My name is Raissa Lerner, Deputy Attorney General for California, representing the California Department of Toxic Substances Control. This is a multifaceted appeal regarding what was initially a little over $100,000 in oversight costs for a $3 million cleanup. I will focus primarily on the NCP issues, although there are lots of other issues raised in the brief. I'd like to first briefly review the standard of review for government agency action under CERCLA in the context of the NCP, and then I'd like to spend some time directing the Court's attention to specific record citations covering each of the elements that the appellant's claim were overlooked and to demonstrate that they were not, in fact, neglected. As an initial matter, the NCP is designed to guide the agency to a non-arbitrary decision. Government agency action under CERCLA 9607A4A is presumed at the outset to be consistent with the NCP. The NCP itself specifies that immaterial and insubstantial deviations will not topple that presumption, and CERCLA section 9613J then discusses judicial review and specifies that courts may disallow costs for procedural errors only if those errors are, I am quoting, so serious and related to matters of such central relevance to the action taken that the action would have been significantly changed had such errors not occurred. Then 9613J2 specifies that the agency action shall be upheld unless the appellants or defendants can prove on the administrative record itself that the action is arbitrary and capricious. As appellants have pointed out, the Motor Vehicle Manufacturing Association case by standard, arbitrary and capricious action by a government agency, is normally not considered arbitrary and capricious when the agency is acting within its area of expertise unless the agency has relied on factors which Congress did not intend to consider or entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs contrary to the evidence before it, or took action that's so implausible that it lacks agency expertise. In other words, there's no rational connection between what the agency did and the facts before the agency. And the appellants agree with that standard in their opening brief, page 25-26. What they're trying to do in their argument, though, in fact, is to hold DTSC to a strict compliance standard with the NCP. And for that there is no precedent and significantly there is no record support for that. They claim you didn't have a remedial investigation and feasibility study. What about that? The remedial investigation and feasibility study, it was Exhibit 205, Trial Exhibit 205, and that's in the excerpts of record, approximately page 305. The entire remedial investigation collectively consists of four documents as specified by the agency at excerpts of record 833. It was Trial Transcripts 202, 203, 204, and 205, collectively comprised the remedial investigation. It's not collected in one document, and it's not stamped with the title Remedial Investigation Report. However, that is simply immaterial. As this Court has recognized in the Chapman case, the question is whether the documents are, and the decision is documented, not whether it's called a specific, by a specific title. And that's true also for the Department's record of decisions. It's contained in the Remedial Action Plan with reference to the Remedial Investigation Report documents. The Remedial Action Plan is Exhibit 207. That's in the excerpts of record. And the District Court had no trouble recognizing that the record of decision, and you can find that finding at excerpts of record 475. It's clear from the record that, first of all, unless it wasn't clear from the appellant's answer, not only did they have an opportunity to participate, they drafted each of the documents that are in the record. They drafted those documents for the Department's approval. The Department at times rejected those documents, sent them back to the drawing board, required them to redo them, and ultimately the Department approved their documents. They themselves chose and proposed the consolidation and capping remedy after they had voluntarily abandoned their soil-washing proposal. That's a finding of fact that was made by the judge at page 459 of the excerpts of record after hearing testimony, extensive testimony by DTSC's project manager and the appellant's own private consultant who prepared the documents. He made a finding that there was a voluntary abandonment of this proposal, that DTSC had provided significant opportunity for them to prove the effectiveness of this proposal, and that they were unable to do so. And that is reflected in the record in the Remedial Action Plan discussing the soil-washing proposal and pointing out that it was unproven to address all of the hazardous contaminants at the site, even though it might have addressed one or two of them. It's clear from the record that DTSC considered seven remedial alternatives. It considered them, in DTSC's own words, in terms of effectiveness, ease of implementation, their qualifications for addressing the contamination, and their cost, with the goal of selecting a remedy that would cover the environment, reduce on- and off-site waste, and be cost-effective. That's at excerpts of record 359 to 60. Ultimately, it found only two remedies would be appropriate for all of the hazardous contamination at the site. That was consolidation and capping, which was the remedy chosen, and off-site disposal. But ultimately, only consolidation and capping would, in fact, address all of the concerns that DTSC considered, because DTSC determined that the remedial alternatives, considering long-term effectiveness and permanence, DTSC determined, and I quote, that consolidation and capping can afford long-term protection from all the contaminated materials, even though long-term monitoring would still be required. And that was specified on page 381 of the excerpts of record and 377, that long-term monitoring would be required for this contaminate, this particular remedy. Asphalt and concrete is not permanent. We all know that. It's not a one-time remedy, but it would be permanent with required monitoring and maintenance. Altogether, that remedy would be permanent, and permanence was considered. DTSC balanced the criteria of the NCP's specific admonition or bias against off-site dumping. Off-site dumping merely reflects, relocates the problem to another place. It may take care of all the contaminants at this site, but it simply moves them elsewhere. It's very expensive. It's very expensive. It was specifically in the record six times more expensive, and it would create a long-term liability for John Alexander, which would never go away, and that's another cost. So all of that was considered in selecting, ultimately, consolidation and capping. It was never selected over the appellant's objections. As I mentioned, they proposed it themselves. It is simply untrue that the remedy is an unlined hole. It is not an unlined hole. The remedy is described at supplementary excerpts of record, page 914. It's a concrete containment cell. It was never true that the remedy was not anticipated to require maintenance. It was always anticipated to require maintenance. DTSC considered cost, as I mentioned. It weighed cost versus effectiveness, compared the alternatives, and made a reasoned, non-arbitrary screening of the remedies available, and chose the most effective remedy available at the time. As I mentioned, there are a variety, a laundry list of things that DTSC was alleged not to have done. Alternative treatment technologies, for example, were considered to the maximum extent practical in this case. DTSC allowed the remedy. That was an alternative treatment technology. Unfortunately, it didn't prove to be effective. DTSC had hoped it would be, but it did not. Treatability studies were allegedly not performed. Once again, a treatability study would be a study if you were going to require a treatment at the site. No treatment was required at the site. The contaminated material was treated. It was consolidated into an area that comprised approximately 10% of the site, leaving more than 90% of the rest of the site available for commercial and industrial development. That's specified in the remedial action plan. It's simply not true that the site is unusable. In fact, the remedial action plan indicates that the owner planned to develop the site. That's at excerpts of record, page 382, and was able to do so using, again, a minimum of 90% of the site. Baseline risk assessment, site-specific risk assessment and routes of exposure are also alleged never to have been considered by the agency. That's, again, belied by the remedial action plan. At excerpts of record 371, 379, and 359, it is clear that the site is unusable. There is no allegation that this was arbitrary and capricious for the agency to have done so, to have looked to very similar sites. There were many other sites in the area presenting similar type of contamination, to conclude that adequate risk assessment had been done, including considering routes of exposure and impacts on sensitive populations, and that that risk assessment work would be utilized for this site. Evaluation of the site, again, is a question of the toxicity of the site. Once again, there's, as the appellants themselves pointed, there's, pointed in their brief, there's approximately 180 pages of soil contamination laboratory results evaluating and determining the toxicity of this site, specifically that it was extremely toxic with respect to the lead contamination. Finally, I'd like to just touch on the community relations plan. The district court did find, and your examination of the record will confirm, that there is no community relations plan that was drafted for this particular site. Rather, DTSC simply followed the basic state law requirements for community relations. In the context of a record that shows that the remedial action plan was placed in the district court, public comment was specifically solicited, public comment on the remedial action plan. The department then held a public meeting at which public comment was again solicited and received. The department then summarized and responded to the comments and included them in the final remedial action plan. In that context, it's simply not arbitrary and capricious for the agency not to have written up all its intentions to engage in all of these various activities, stamped it with the title remedial community relations plan and put that in the record. You say there was a plan, it just wasn't as a separate document. Exactly. And there is evidence in the record that DTSC followed a plan, engaged the community, and there's no allegation that what they did was inadequate under the NCP. And it's simply untrue that DTSC failed to provide the responsible party or the public with any ability to review their actions as appellants allege in their reply brief for the first time on page 24. In this context, and appellants do not even attempt to articulate this for the court, in this context, it's impossible to find that DTSC behaved in a manner described as arbitrary and capricious by the Supreme Court in the motor vehicle manufacturing case. It is simply untrue that this case is anything like the Washington natural gas case that was decided by this court, where there the agency, which in fact was not, was a transportation agency, was not an environmental protection agency. It was a transportation agency that in the process of building a road discovered that contamination in its way and had to stop its work and deal with that, did a very cursory remedial investigation that turned out to be completely inadequate. It discovered less than 10 percent of the actual toxins' presence on the site. And once the evidence began to roll into the agency that the problem was far greater than they had ever imagined, involving tens of thousands of additional tons of toxic material, the agency simply ignored that, relied on its initial remedial investigation geared to a far smaller problem, and then proceeded to didn't consider any remedial alternatives other than the one they had selected, and never put their plans out for public comment. In that case, I think it was relatively easy for this court to find that it was arbitrary and capricious, because the agency had ignored the evidence before it, the agency had failed entirely to appreciate an important aspect of the problem, that is, failed to characterize the site, failed to determine the full extent of the contamination present and what could be done about it. And that case clearly meets the remote vehicle manufacturer's standard for arbitrary and capricious in a way that the few items that appellants have picked out here in an attempt to impose strict compliance on the agency simply does not meet that standard. Moving on to address a few of the other alleged insufficiencies by the district court, the indirect costs, the appellants now allege that DTSC utilized an improper formula. They never made that argument to the district court. The only argument they made to the district court was that the federal government gets a better deal. And, second of all, there's no legal support for the notion that a private party should not pay the precise, indirect costs that are incurred by the agency. And, third of all, there's no legal support for the notion that a private party should not pay the precise, indirect costs that are incurred by the agency. There was no proof offered that they were excessive. Again, they claim that DTSC's indirect costs include the costs of other agencies' activities, and just assume that that's excessive. If the other agencies' costs are, let's say, $1.5 million, that's part of what supports DTSC's program, then those other agencies' costs can be included. For example, the Department of Finance that oversees budgets, or the Department of Personnel Administration that deals with employees, a certain percentage of those costs cover all of the agencies of the state, because that's what is required for the agency, the individual agency, to function. So they made no, they made no... What you do as a standard method of operation is you take part of the costs of running the Department of Finance and attribute it to these kinds of cases? There was detailed evidence put in the record for how DTSC computes its indirect costs. That evidence was unrefuted, and that evidence hasn't been... What's the burden of proof on the costs? DTSC has the burden of proof on the costs. DTSC put in all of its records on indirect costs and direct costs. DTSC also put on a expert, not an expert witness, their own in-house cost recovery person to explain to the court what the documents were, how the indirect costs were calculated. This is witness Jeffrey Mahan, and Jeffrey Mahan was subjected to cross-examination, as well as to examination by the court. The court wanted to understand how are these costs calculated, and in the end made a finding that those costs were accurate and trustworthy against the appellant's argument that they were inaccurate and untrustworthy. But the appellant's made no argument, and it was never... The facts that were in the record are those presented by the department, right? And then the judge examined those facts and reached his conclusion that they were all, all the items were proper. Yes. That you carried your burden with respect to each of those items. Yes. And that first made the finding, which is really a legal conclusion, that indirect costs are recoverable, that all of the costs, all of DTSC's costs in providing oversight are recoverable. And that includes direct costs and indirect costs, and there is substantial case law that supports that. So they made a legal claim that it was not... Are to pass that issue to the next one, which is that they thought they were excessive, even so... Yes, but there was no evidence that they were excessive. There was no evidence presented to the district court. There was no evidence here. There's no citation, any record, evidence that they are excessive and that the district court was clearly erroneous in concluding that they weren't. Do you just apply a formula for the indirect costs that goes in each case, or do you figure them out for the particular case? I believe there was testimony on that in the record, that DTSC has a, is not a case-specific formula. It is for the program, for the site mitigation program in general. So it's not department-wide. The indirect costs are not figured out on department-wide basis. They're on a program basis, but not on a case-specific basis. So the indirect, there wasn't a special formula that was developed for this particular case, but there is a special formula that's developed for the department's site mitigation program, which deals with similar cases. I see my time is up. If there's no further questions, I would ask for an affirmance. Thank you. Very briefly, Your Honors, the issue I think that was stressed at the beginning of the Council's presentation for the appellees going to the Motor Vehicle Manufacturing Association case, where the agency was seeking cost recovery entirely from the agency. And the agency fails to consider mandatory factors, can't make the link between those mandatory factors and the facts that they have before them. The court, when they're reviewing the administrative record, has nothing before it to make a determination of whether or not the agency has even supported its decisions. With all that lacking in the record, and the trial court's findings of that clearly lay out in a number of places where a DTSC failed to consider some of these mandatory factors, but then the court goes on and tries to infer or fill in those gaps, in essence, substituting its own judgment for what DTSC had done. That is not something that would be permitted under Motor Vehicle Manufacturing Association, and we believe is error. On the issue of the proposal by the appellants here, appellants did hire an engineering firm. The engineering firm, as counsel for appellees indicated, in an iterative process back and forth with DTSC, prepares documents. But ultimately those documents are the product of DTSC. They set the agenda. They tell us what has to be in the documents. And if we don't put something in there that they want us to put in there, they'll reject the document. And you'll see in the record where there's a number of letters going back and forth between DTSC and the appellant's consultant on problems with the documents and how to heal them. I think there was a reference that the containment facility with the cap on it may be a concrete cell. I believe the record will support that it's actually clay lined and not concrete. On the issue of whether or not the department used a risk assessment from another site, I think counsel for appellees mentioned that they did, in fact, use a risk assessment, not for this site, but for a different site. That was one of the errors that we pointed out. And there was an analysis in that other risk assessment that concentrated on sensitive plants and not on human beings. The community relations plan, as we indicated, there is no written plan. What the state had intended apparently all along was to proceed under state law, not under federal law. That's why we have problems with the nomenclature, and that's why we have missing elements from the analysis. Finally, on the indirect costs, I would note that what we indicated in the trial was that DTSC reaches out to the Office of the Governor, to the General Services Administration, other state agencies not related to DTSC's site investigation or oversight here. They reach out to these other agencies and sweep in other indirect costs from these other agencies that we believe is an error under OTADI versus GOSS, which would indicate that indirect costs must relate to the agency's activities at the site. Based on that, we would submit, Your Honor, and ask that the judgment be reversed, both as to the attorney's fees judgment and also the underlying judgment on the cost recovery. Thank you.
judges: Reinhardt, Siler, Hawkins